FREDERICK F. WILSON

*v.*

GEORGIANA B. TERRY et al.

[Decided November 2d, 1905.]

1. Where an absolute deed is claimed to be a mortgage, the burden of proof is upon the grantor, and the proof must always be clear and convincing, and where the grantee is the wife of the grantor, that fact has an important bearing on the nature of the transaction, and the ordinary presumption of a gift must also be overcome.

2. Where complainant is called as a witness in an action to have his deed to decedent declared a mortgage and for an accounting, in which action he is also a party as administrator of decedent, his testimony of transactions with decedent to show the deed was a mortgage is in his own behalf, and not in his behalf as administrator, and is inadmissible under the Evidence act. *Rev. 1900, P. L. p. 363 § 4.*

3. Evidence given after the death of the grantee in a deed, as to her verbal statements made after its execution, in the nature of admissions that the deed was intended as a mortgage must be very clear and convincing, in order to overcome the effect of the previous conduct of the parties to the deed during her life, and the written admissions of the grantor tending to show that the deed was absolute.

On bill, amended bill, answer, replication and proofs.

*Mr. Frank Durand* and *Mr. David Harvey, Jr.,* for the complainant.

*Mr. James D. Carton* and *Mr. Gilbert Collins,* for the defendants.

EMERY, V. C.

The complainant's bill is filed by him in his individual capacity and as administrator of his deceased wife, against the two defendants, Mrs. Terry and Mrs. Smith, the sisters and heirs-at-law of his wife.

The general object of the bill is to have the absolute deed, under which the wife at her death held the title to a hotel property at Asbury Park, called the Laurel House, declared to be only a mortgage given to secure the wife for the advances made or liabilities assumed by her in the payment of debts incurred by her husband in the purchase and improvement of the property. The money for the payment of these debts of the husband, amounting to about $6,000, was procured from the Long Branch Banking Company, upon the individual note of the wife for that amount, on the transfer of the property to her by the husband, and it is claimed by the bill that the object of the conveyance to the wife was to secure her for the liability assumed on the note, and that the note was subsequently paid out of the rents of the property. The entire indebtedness is alleged to be paid and a decree is asked declaring and directing a conveyance from the heirs to the complainant. The bill was originally filed by the complainant alone, but being in effect also a bill to redeem, including an account of the amount due on the mortgage, the administrator of the alleged mortgage was thought to be a necessary party, and at the hearing the bill was amended, by consent, making complainant a party in that capacity. No claim, however, is made for rents received beyond the payment of the mortgage, and it is alleged by the bill that complainant, as well as his wife, had control of the rents after the execution of the deed. The circumstances under which the deed to the wife was executed were as follows: The complainant, in July or August, 1883, agreed to purchase of Rev. George Clarke the land in question, which was then unimproved, for $8,000, and paid $200 on account of the purchase-money. In the fall of 1883 complainant, before securing title, commenced the erection of a large hotel building on the premises, which was ready for renting by May, 1884, and was then rented to a Mrs. Pemberton, for three years, at $1,600 a year, besides $225 per year for the

rent of two stores in the building, altogether $1,825, all of which was paid to complainant before the delivery of the deed, in December following. Complainant had not sufficient means to pay for the building erected, but had from his own property made payments on account to the extent, as he claims, of about $4,000, including the amounts received from rent. One thousand seven hundred dollars was paid to the mason, of which $1,300 was paid by conveying to the mason a property owned by complainant and taken at that value, and complainant claims to have paid, besides, about $600 to Martin, a carpenter, on account of his bill, between $200 and $300 to the painter, and other payments to the slater and men working on the building, the amounts of which are not specified. He also paid Barber, Towner & Fielder about $2,000 on account of their bill of $4,000, borrowing for this purpose the note of a Mrs. Harrison, which was endorsed over by him to this firm. There is no sufficient reason to doubt that the complainant, before the passing of the title, about December 15th, 1884, had expended from his own funds (including the rents of the property) about $5,000 (including the $2,000 note) towards the purchase and improvement of the property. There still remained debts to the amount of about $6,000, and complainant's means, as well as his credit, were exhausted. Complainant had previously arranged for a loan of $9,000 on the property from the executors of a Robert Patterson, but beyond this does not seem to have been able to borrow from outsiders money on the property. Mrs. Wilson had considerable property in land and securities, but had not·in cash sufficient means to pay the balance due on the property. The builders were pressing for payment and threatening suits and liens, and at least one suit was commenced against Wilson, on which judgment was obtained. In this situation Wilson applied to his wife, who agreed to take over the property and pay the outstanding debts. The arrangement by which this agreement was carried out was as follows: On December 15th, 1884, Mr. Clarke, the vendor, together with Mr. and Mrs. Wilson, Mr. David Harvey, Jr., counsel for Mr. Wilson, and Mr. Hawkins, counsel representing building creditors, and Mr. Johnson, the cashier of the Long Branch Banking Company,

met at Freehold. Mr. Clarke delivered his deed for the property, made out to the complainant, dated October 21st, 1884, and acknowledged November 28th, 1884, by Mr. Clarke and his wife, before an officer of Westchester county, New York, where they then resided. Complainant executed and delivered to Clarke his own bond (bearing the same date as the deed) for $8,000, the entire purchase-money, payable in three years, which was secured by a mortgage on the premises, executed by Mr. and Mrs. Wilson to Clarke, dated October 21st, 1884, but acknowledged on December 15th, 1884. Wilson delivered, also, his bond for $1,000 to the executors of Robert Patterson, also payable three years after its date, and Mr. and Mrs. Wilson also executed a mortgage on the property to secure this bond. The bond and mortgage were both dated October 21st, 1884, but this mortgage was executed and acknowledged December 15th, 1884, the first day of the meeting at Freehold, but because of the omission to have checks certified the deliveries were not made on that day. On the following day the Patterson executors paid to Clarke $8,072 (being the principal sum, with interest from the date of the mortgage), taking an assignment of his mortgage, and the $1,000 loaned on the mortgage was, according to Mr. Harvey, paid to the complainant, but was probably used to pay the expenses of obtaining the loan and the interest due Mr. Clarke. On the 16th of December, Wilson and his wife executed to Edward M. Fielder a general warranty deed for the premises, subject only to the $9,000 mortgages, for the nominal consideration of one dollar. This deed to Fielder was made for the purpose of conveying the title to Mrs. Wilson, and Fielder did not assume the payment of the mortgages. The deed from Fielder and his wife, drawn and dated on the 15th of December, was acknowledged and delivered on the 19th. This was a bargain and sale deed, conveying the premises to Mrs. Wilson, for the nominal consideration of one dollar, subject to the $9,000 mortgages, the payment of which was assumed by Mrs. Wilson. Whether Fielder was present on the 16th does not clearly appear, but his wife was not there, and the delay of three days in conveying the property to Mrs. Wilson was probably due to the necessity of her joining in the deed. On December 15th,

1884, and before the conveyance to her of the hotel property, Mrs. Wilson and her husband executed to the Long Branch Banking Company a mortgage upon other property in Asbury Park, belonging to Mrs. Wilson, to secure the sum of $6,000. This sum is declared to be payable according to the condition of a certain bond in the penal sum of $12,000, but the bond has not been produced. This mortgage was recorded on the date of its execution, and before any of the deeds or mortgages on the hotel property were delivered and before the mortgages were executed. Mrs. Wilson also assigned to the bank, as further security for the loan, mortgages on property in Cincinnati, held by her as her own property. On the same day, December 15th, 1884, Mrs. Wilson gave her individual note to the bank for $6,000, payable three months after date, and the amount of this note, less the discount ($93), was placed to her credit in the bank on December 17th. By checks on this account, all dated December 16th, 1884, amounting to $5,809.50, Mrs. Wilson paid all the bills outstanding against the property. This included $180 insurance and $82.50 taxes on the property. The $1,000 received from the Patterson executors was probably taken for the payment of the commission and expenses of the loan, about $400, Mr. Wilson says, and the interest due to Mr. Clarke. A memorandum in Mrs. Wilson's diary, under date of December 16th, states that Clarke received $8,478.53. On this transfer of title no evidence of debt from Mr. Wilson to his wife was given, nor was any written agreement or other paper executed, either at the time or afterwards, to further explain or qualify the transaction as between Mr. and Mrs. Wilson, nor does Mrs. Wilson seem to have been specially represented by counsel. The value of the property at the time of the transfer has been estimated at from $15,000 to $20,000. None of the defendants' witnesses fix the value at less than $15,000 in 1884, which figure is also fixed by one of the complainant's witnesses. The estimates of value given after this length of time, and only from general knowledge and recollection of the values of property at that time, are, of course, to be considered with some caution. Complainant and Mr. Clarke, estimating the values rather from the basis of the cost of the land and buildings, fix, respectively,

about $19,000 and $20,000 as the value, in which latter estimate Mr. Winsor, another witness for complainant, concurs. He was, in 1884, secretary of a building loan association, which made loans in Asbury Park, and also owns property in the neighborhood and has bought and sold property in that locality. The property was in a good location, and 'a fair value at the time, had the question been one between seller and purchaser dealing at arms' length, would probably not have been as low as $15,000, neither, on the other hand, as between borrower and lender, dealing on the same basis, would a sum as large as $15,000 have been loaned on the property. Mr. Johnson, for the bank, had declined to loan $3,500 on the property subject to the $9,000 mortgage. It is clear, I think, that in this transaction, and in order to determine whether by the agreement between the parties made at the time the absolute title was to be conveyed to Mrs. Wilson, or whether, as complainant claims, she took the title only to secure her against the liabilities she assumed on the note and mortgages, due weight must be given to the fact that the transaction was between husband and wife, and that the husband was dealing with the wife's money, for his benefit, in relieving him of obligations he had incurred. The relations then existing between husband and wife were not only amicable, but it appears, also, the wife was devoting her own income to the support of herself and husband, as for personal reasons she did not wish him to continue active work in his profession of minister.

The complainant, Mr. Clarke, the vendor, and Mr. Harvey, the attorney for Mr. Wilson, are the only survivors of the persons attending the meeting at Freehold, and their evidence is strongly relied on to support complainant's claim. [Evidence here examined in detail.]

Complainant's evidence as to transactions with the wife was admitted, subject to objection, and leave reserved to move to strike out the evidence at the argument. My impression at the hearing was that, under the ruling in *Smith* v. *Burnet, 35 N. J. Eq. (8 Stew.) 314 (Court of Errors and Appeals, 1882)*, and *Adoue* v. *Spencer, 62 N. J. Eq. (17 Dick.) 782, 794 (Court of Errors and Appeals, 1900)*, the evidence was inadmissible under the Evidence act (*Rev. 1900, P. L. p. 363 § 4*), excluding

"testimony to be given by any party to the action as to any transaction with or statement by any testator or intestate represented in said action, unless the representative offers himself as a witness on his own behalf and testifies to any transaction with or statement by his testator or intestate, in which event the other party may be a witness on his own behalf, as to all transactions with or statements by such testator or intestate which are pertinent to the issue."

The administrator being a necessary party in the suit, the rule considered by me in *McKinley* v. *Coe, 66 N. J. Eq. (21 Dick.)* 70 (*1904*), to be settled in this court, that the evidence was admissible in suits against heirs or devisees to which the administrator was not a party, does not apply. Counsel for complainant urge that the evidence is admissible as evidence given by the administrator on his own behalf under the statute. The complainant was, however, called generally, and the evidence was given on his behalf individually and not specially on his behalf as administrator.

On a bill to have a deed declared a mortgage, the interest of the mortgagor and of the personal representative is perhaps the same, so far as it involves the conversion of real estate into a personal security, upon which the personal representative is entitled to receive the amount due, but it is essentially an adverse interest in that it seeks to impose on the personal representative a contract of the testator under which the representative is bound to account under the mortgage. Regularly, therefore, the representative would be a party defendant in such suit, not a party complainant, and the fact that complainant is himself the representative, and must therefore be complainant in that character, does not make the evidence given by complainant tending to establish his claim against the personal estate evidence given by the representative on his own behalf, *i. e.*, on behalf of the estate. Excluding the evidence of complainant as to the circumstances under which the deed was originally given, I do not think the evidence of Mr. Clarke and Mr. Harvey, the only other witnesses as to the facts transpiring at the time of execution of the deed, warrants the conclusion that the title was intended to be conveyed to the wife by way of mortgage only, and not absolutely. Their evidence must be taken in connection

with the things actually done, and their statements as to the wife's taking title go no further than to show that the property was supposed to be the wife's security for the liabilities she was personally incurring, and which she was expected to pay and was able to pay. This would be the case whether the title was absolute or by way of mortgage, for the wife undoubtedly supposed she was running some risk in raising the money and had nothing to show for it but the property. The documents executed are all consistent with the intention, as between husband and wife, that the title then taken should be absolute in the wife. Her assumption of the mortgages for $9,000 is not to be explained in any other view, nor is the absence of any writing or document, showing either that any debt from the husband to his wife existed, or that the husband held any right in the property, consistent with the view that the title was not absolute. The wife was acting without counsel, and it was a situation in which no counsel would probably have advised her that the transaction was a safe or prudent loan. She should therefore not be deprived of any right or advantage given to her by the transfer, unless it clearly appears that it would be inequitable for her to retain it; nor should she be deprived of the title she received except upon very clear and satisfactory evidence that she then understood that the title was not absolute in her, but was then intended merely as a mortgage, and that her husband had the right to call for a reconveyance. The general rule in all cases where absolute deeds are claimed to be mortgages is that the burden of proof is upon the grantor, and his proof must be clear and convincing, and the present case is within the application of the additional rule or presumption relating to conveyances of property from the husband to the wife, viz., that the conveyances, so far as they are not based on consideration, are presumed to be intended as gifts of the husband's property to the wife. In this case the husband and wife were not bargaining with each other at arms' length, but the wife, at the husband's instance, was undertaking to relieve him of the liabilities then pressing him for the purchase and improvement of the property, and to save the amount he had already expended. The amount which Mrs. Wilson assumed was much more than would be ad-

vanced as a mere loan on the property, and was nearly, if not quite, the full value of it. The husband's entire property was exhausted, and beyond the amounts paid by Mrs. Wilson, he was liable on the $2,000 note of Mrs. Harrison, borrowed for his benefit and endorsed over to Towner for debts incurred in building the hotel. Mrs. Wilson did not assume this or any other indebtedness or obligations beyond the $15,000 for debts which were chargeable on the property itself. It is probable that Wilson's financial situation at the time was a motive, at least on his part, and probably on the part of both husband and wife, for having the absolute title of the property in his wife,. and for passing the title in such manner as to clearly show a purchase on her part for the fair value of the property. All documents indicated a purchase, and none were executed which indicated a loan to the husband or a mortgage of his interest in the land, and this view that Wilson's financial position and prospects were one reason for making the transaction an absolute sale to the wife, rather than a mortgage, derives additional probability from Wilson's subsequent conduct. [The evidence on this point is then examined.]

Looking alone at the whole evidence relating to the circumstances up to the time of the execution of the deed, I find that this evidence is not sufficient to establish that the deed was not an absolute deed, but a mortgage. And the further question is whether the evidence relating to the action, conduct or declarations of the parties, and especially of Mrs. Wilson, subsequent to the deed, either alone or taken in connection with the other evidence in the case, is sufficient to establish that the deed was originally intended as a mortgage. The intention of the parties at the time of the execution is the vital question, and the evidence of subsequent transactions is generally important only as authorizing inferences in relation to the intention at the time. *Frink* v. *Adams, 36 N. J. Eq. (9 Stew.) 485 (Vice-Chancellor Van Fleet, 1883)*; affirmed on appeal, *38 N. J. Eq. (11 Stew.) 287.* But, in relation to their subsequent conduct, the relation of the parties has also an important bearing, for even if the original transaction was only for securing the wife's obligation on the note, as the bill alleges, the subsequent investment in the

property of the wife's money, with the consent and acquiescence of the husband, while the title stood in her name, might, under the usual presumption as to husband and wife, be considered as indicating a gift on the husband's part of his entire interest in the property.

The evidence relating to the dealings of the parties—Mr. and Mrs. Wilson—with the hotel property, subsequent to the delivery of the deed, including the evidence offered as to their declarations in regard to it, is substantially as follows: [This evidence is then examined in detail.]

Outside of the testimony of Mr. Wilson himself, the principal evidence of communications after the transfer between the husband and wife relating to the ownership of the property, are letters of complainant written to his wife, in October, 1897. At that time Mrs. Wilson was at the house of her sister, Mrs. Smith, in Asbury Park, having gone there in consequence of some quarrel or misunderstanding with her husband. Mr. Smith, the brother-in-law, says that one cause of the difference between them was Wilson's refusal to give Mrs. Wilson the deed for the property now in question. Wilson came to Smith's house to see his wife, and in the interview between them Mrs. Wilson accused her husband of having the deed, and of always claiming the hotel wasn't hers, to which Wilson said: "I don't claim the house; I have got no interest in the house; it is your property and it all belongs to you." Wilson wrote several letters to his wife while she was at Smith's house, urging her to return to their home, and in these letters her ownership of this property, and not his, is also asserted by Wilson, apparently for the purpose of reassuring her against his claims. One of October 8th is especially important as giving a statement of a bargain in reference to the Laurel House. He asks her to come home and talk things over, and says that it is

"annoying for Mrs. Smith to tell you you had no property. It is all yours and a very fine property. You said after the Laurel House was out of debt you were going to let me have so much a month, but after being here so many years I have nothing yet."

In another letter he tells her that her property is increasing,

and after stating he had heard Mrs. Smith had said $2,000 or $3,000 were gone, and that he had bought lots with it, he says this was untrue; that the property had been well managed; that he had bought nothing with it except the Allenhurst property, which was in her name, and adds:

"the property is all yours and we have made several thousand, come home and enjoy it. Mrs. Smith knows she tells what is not so when she tells you you have no property. No one believes her and any goose knows better. All yours and all straight."

These letters, written at the time when the question seems to have been directly raised between the husband and wife as to the ownership of this property and his alleged claims on it, cannot be reconciled with the view that both the parties intended the title to be taken only as security for debts or obligations, and it must require very clear and decisive evidence to the contrary to outweigh these admissions of the complainant, advisedly made, and made for the purpose of procuring her return. Had complainant's present claim been then set up, Mrs. Wilson would have had the opportunity to defend her ownership, and the husband's direct and unreserved admission of his wife's ownership at that time has an important bearing on his right to contest it, after his wife's death and at this lapse of time.

Mrs. Wilson returned to her home shortly after these letters were written, and lived with her husband up to the time of her death. After her return Mr. Wilson seems to have again taken charge of the hotel, leasing it and collecting the rents, and attending to the repairs and management of the property. One of the tenants, Mrs. Kemp, paid the rents by checks to his order, and these were endorsed by him and deposited, as he says, to Mrs. Wilson's account in the bank where Mrs. Wilson kept her account. In all of the other tenancies the checks were made either to Mrs. Wilson alone or jointly to both, and all checks went ultimately to Mrs. Wilson's credit. Mr. Wilson does not appear to have kept any separate bank account after the transfer of title, nor to have had resources of his own. It appears, also, that the expenses for the support of the family were paid from Mrs. Wilson's income, including that received from the

hotel, and I think Mr. Wilson's management of the hotel, under these circumstances, is to be considered rather as a management of his wife's property than the continued possession and control of the property by a mortgagor, as is now claimed on his behalf.

In addition to the evidence above referred to, complainant relies on oral declarations proved to have been made by Mrs. Wilson subsequent to 1898, when she returned home. In some courts it is held that evidence of subsequent oral admissions by a grantee that an absolute deed was intended as a mortgage is not sufficient without corroborating circumstances to establish this fact. *1 Jones Mort. (5th ed.) 241 § 335,* and cases cited, note *(4)*. And certainly evidence of this character, in order to divest the title to lands and to overcome the effect of the previous conduct of the parties and written admissions of the husband, must be scrutinized with great caution, after the death of Mrs. Wilson, and be very clear and convincing.

In none of these conversations does it appear clearly that the attention of the wife was distinctly drawn to or fixed on the question whether this deed was only a mortgage or whether she had the right to hold the title to the property, if she chose to do so, and many of the declarations are such as may fairly be considered expressions indicating nothing further than that this hotel was an enterprise of Mr. Wilson's, and not of her own, and that she had taken hold of it to save the money he had put in it, and that Wilson was managing the hotel.

[The evidence is then examined in detail.]

On the assumption that these conversations give in all respects Mrs. Wilson's exact words, and giving them all fair effect, they are not sufficient, in my judgment, to outweigh the evidence as to the nature of the original transaction, which is supplied by the documents themselves, and the conduct and admissions of the parties under them, up to at least the year 1898. Mrs. Wilson's account or explanation of any of them cannot now be heard, and bearing this in mind in considering the weight to be given to them on the questions now to be solved, viz., the agreement at the time of the transfer of title, or at the time of Mrs. Wilson's subsequent investment of her money in the property by the payment and cancellation of the Patterson mort-

gages and otherwise, I think that, outside of the conversations sworn to by Mr. Sexton and Mrs. Kemp, the scope of statements cannot clearly be held to go further than to give what was then (in 1898 or later) Mrs. Wilson's statement as to her motive in taking the property and an explanation of her investment. The direct statement made to Mr. Sexton that "the property is Mr. Wilson's; what money I have put in it I have put in for his benefit," was a statement, not that she had lent money to Wilson which he was to pay back or account for, but that she had put her money in the hotel to help him out, as she wanted him to have something in his old age, and imports rather a gift to Wilson of the money she put in. This may well have been her intention as to the ultimate disposition of the property, but so long as she held the title in her own name, this gift was still unexecuted and under her own control, and in none of these conversations is there any sufficiently clear indication on her part that the title to the property was not then her own, or that she had no right, as between herself and Wilson, to hold the title as her own. These conversations all occurred after the reconciliation, in 1897, after a separation, during which she was reassured about her title to this very property, and her subsequent declaration as to her husband having this property or the benefit of it, are very probably due to a subsequent change in her disposition toward her husband, while living amicably with him, and having the benefit of his management of the property. And while they may possibly be taken to indicate her intentions in reference to the property, they are not sufficient to divest her title after her death.

Upon the whole evidence, I conclude that complainant has failed to make out a case for relief, and the bill must be dismissed.